with 22-2763 Cooper v. Franklin Templeton. Attorney Litt, you've reserved two minutes for rebuttal. Is that correct? I have, yes. Thank you, Your Honor. Thank you. You may proceed when you're ready. Good morning, Your Honors. May it please the Court. Matthew Litt from Litt Law on behalf of the appellant plaintiff Amy Cooper. Focusing initially on Ms. Cooper's defamation claims, this case is textbook actionable mixed opinion. The statements of the defendants implied to any reasonable reader that, number one, the defendants had facts unknown to the public, and, number two, that the defendants used those facts to make the determination that Ms. Cooper was a racist. The complaint contains four statements of the defendants comprising the context of the actionable mixed opinion. First, on the day of the incident in Central Park, May 25, 2020, the defendants told the public on Twitter, we are in the process of investigating the situation. The very next day, on the very same social media platform, Twitter, the defendants told the same public that they performed an internal review of the incident in Central Park and that the result of that internal review was to terminate Ms. Cooper. Are you arguing that they didn't do an internal review? I'm sorry, Your Honor? Are you arguing that they didn't do an internal review? That's correct, Your Honor. Well, they looked at the film, right? That was all there was? They watched the same publicly available video that everyone else did. What more would you have had them done? Well, what I would have... I guess I'm going to take a step back and say when the defendants told the public that they were performing an investigation, that they did an internal review... Of the incident in Central Park. Right, that they performed their due diligence, they said that they had undisputed facts, and they told the public that they never rely exclusively on social media for making a decision like this one. That implied to the public... In the context of that statement in which they said they wanted to make sure that the video hadn't been edited or spliced in some way so as not to be what people were suggesting on social media took place. But just on the prior statement, you left off the phrase when you said it just now, and you leave it off in your brief sometimes when you talk about it, the internal... This is the May 26th statement, the internal review of the incident in Central Park yesterday. That... I mean, the reasonable reader is presumed to read all of the words, are they not? Absolutely, Your Honor. So why would the reasonable reader think that the internal review of the incident in Central Park yesterday would be about anything other than the incident in Central Park yesterday? Well, it's not that it would be about, necessarily be about something other than the incident in Central Park, but it's that they, that Franklin Templeton, the defendants, had more information than the public did. You don't need to do an investigation. You don't need to do due diligence. You don't need to do an internal review to watch the same video the rest of the world watched. Could Franklin Templeton have fired the woman simply after looking at the video and getting information about her 911 call? Could they have, Your Honor? Yeah. On defamation, absolutely they could have. This is only actionable defamation because they implied that they did more and had more than the public. Well, maybe they looked at the video twice. Respectfully, Your Honor, I don't believe- They looked at it two or three times to be sure that they could believe what they were seeing. That may be, Your Honor, but we don't- They told us in the later statement, the June 2nd statement, what they were doing, which, I mean, it came later, but it's one of the statements that your defamation claim is based on. They said, we needed to spend time. Sometimes videos can be manipulated, and so you have to make sure that you've reviewed all of the facts. The reasonable reader, Your Honor, respectfully, would not believe that reviewing all of the facts means watching the same video that they did. What about the incident? What other facts would you have them review if they're talking about the incident the day before in Central Park? Before declaring that Ms. Cooper was a racist, I would have- They're her employees. But where did they say she was a racist? They said, we do not tolerate racism. Correct, Your Honor, but every- That's different. It was connected to Amy in every single statement. I don't know what- Pardon me? The statement that they do not tolerate racism was made connected to Amy every single time. If you look at the video, the connection is automatic. Have you seen the video? I have, Your Honor. Okay. And what I- She's out there saying, I'm afraid for my life because this black man is filming me. I believe, Your Honor, what she says is she is a woman who was afraid for her life and being made to be afraid for her life very intentionally by a man who had done that to you. Who made her afraid for her life? He approached her alone in the ramble. Sorry, go ahead. He approached her alone in the ramble in Central Park and said to her, if you don't do what I want you to do, I'm going to do something that you don't like. And the complaint contains allegations from an African-American male who was confronted by this same person in the park weeks earlier who said that if he were a female alone in the park, he would have been afraid for his life, too. Well, let's assume your inference is available that the statement about not tolerating racism could lead to a conclusion that the employer believed that the plaintiff was a racist. Stating someone's a racist, it's clear under New York law that's a non-actionable opinion alone, right? I understand your argument about undisclosed fact, but let's just start with that first premise that an accusation of racism is non-actionable opinion. Do you agree with that? Oh, no, correct, Your Honor. Okay. I agree with that. So then, from that, you're arguing that because of the context of the investigation language, the reasonable reader would conclude that the investigation led to facts of the plaintiff engaging in racist acts in some way that led to the conclusion that she's racist. Is that the argument? Correct, Your Honor. The heart of actionable mixed opinion is not that they called her a racist. It's that they announced that they determined her to be a racist using superior investigation. Where did they say she was a racist? Read the lines that you based that assertion on. Sure. So, for example, the May 26 tweet. Following our internal review of the incident in Central Park yesterday, we have made the decision to terminate the employee evolved effective immediately. We do not tolerate racism of any kind at Franklin Templeton. There's no way to read that other than that Amy, an investigator, a reviewer performed... There's a fair difference between racism and being a racist. I don't think the reasonable reader would see it that way in that tweet. It can be, Your Honor. It seems perfectly reasonable to me. I don't know how a reasonable reader can read that tweet, which is all together, and not conclude that an investigation had been performed, Amy was terminated because she was determined to be a racist. Well, how about a distinction if it said or the meaning was that she engaged in an act of racism? Still a non-actionable opinion? I'm sorry, Your Honor. Can you repeat that? Sure. Let's say the reasonable reader would read the previous sentence and then we don't tolerate racism of any kind at Franklin Templeton. Even if we disagree that from that you can conclude a reasonable reader would say that the plaintiff is racist, a reasonable reader could conclude that the speaker is accusing Ms. Cooper of engaging in an act of racism. My question then is, is that still a non-actionable opinion? And again, bracketing for a moment the question about undisclosed facts and mixed opinion, but just that you conceded you're a racist, is that a non-actionable opinion? You engaged in an act of racism, is that a non-actionable opinion? Putting aside the mixed opinion portion of it? It's a closer question, Your Honor. But I would say without the investigation portion of it, it's probably an opinion. Okay, so same argument you're going to make, whether it's she engaged in an act of racism or she's a racist, whatever of those differences available, you still have to rely on undisclosed facts to formulate that opinion. Correct. Is it your position that Franklin Templeton wasn't justified in dismissing her? Yes, Your Honor. It is our position. The reason is that Franklin... I'm sorry, Your Honor. So the reason is that, first of all, I think it's critical to remember that we are in the motion to dismiss stage, so all we need to do is nudge this into plausibility. But what we do have, even at this early stage, is a blueprint from Franklin Templeton that they provided in an interview to Yahoo Finance, where they said, in situations of high-profile alleged wrongdoing of our employees, we don't rely exclusively on social media. But they did for Amy, without any explanation. But we are talking now about the race and sex-based discrimination. Correct, Your Honor. They didn't follow their own protocol in Amy's case. She was an admiral employee, right? She was, Your Honor. Yeah. So Franklin Templeton is in a highly competitive business. This incident occurred that went viral. Tens and tens of thousands of people who saw it. And so, if you were running Franklin Templeton, you would be worried, would you not, that the public is seeing an employee of my company who's got bad judgment, who's got limited impulse and temper control, and she's performing in public. Why would you want to keep her on your payroll? So, I think a couple of things, Your Honor. I mean, the first thing I would say is, this concept that we've come, the public has come to understand today, that she had bad judgment and she did something wrong, as opposed to just being a terribly frightened woman in Central Park. I mean, if she was 15 years old, you may have a different argument, but she was an adult. If she wasn't the victim of PTSD, maybe we'd be talking about something different. But I think the problem is that we're working from a narrative that the defendants helped to create and disseminate. Well, we have an adversary proceeding. That's their job. In the public. I don't mean in this courtroom, but in the public, the defendant. I don't mean defendant's counsel. I mean, defendant helped create this narrative that this was an impetuous woman who had bad judgment and no impulse control. You've got to admit, the film is an eye popper. Your Honor, I think reasonable people can look at that video and see different things. So still, on the law that you're relying on, to the extent for your federal discrimination claim, it's a race-based claim. And as best I understand your argument, it is that they fired her because they concluded she was racist and therefore race discrimination. And we have clear law binding precedent in the Marischello case, which says that racism is not a race and discrimination on the basis of alleged racism is not the same as discrimination on the basis of race. Why isn't that foreclosed, your race-based discrimination argument? I think there's some nuance there, Your Honor. So in the case you just cited, an employee was accused of racism quietly, internally, one time. Here, the defendants were accusing Ms. Cooper of racism publicly over and over again. We're not talking about the defamation claim. We're talking about the discrimination claim. Yeah. So how, as a matter of law, does it fit into the analysis whether they say I'm firing her because she engaged in an act of racism or I'm firing her because she's racist? If they say that alone in a room or to the world, what difference does that make as a matter of law? The difference is that the defendants' campaign to prop themselves up on the back of Amy Cooper would not have happened, would not have worked, if she was not a white female. How are they propping themselves up on the back? I don't understand that assertion. They went on a campaign to show the world that they stood up against racism by firing an employee who shouldn't have been fired or should have been entitled to an investigation before she was fired. Counsel, this company, as they said, was facing a crisis. The president said, I just have to commend our crisis management team. They thought the world was falling in on them. No question about it, Your Honor, but what the defendants have told us through the Yahoo Finance interview is that that's not how they operate in situations of crisis. They look beyond. Was this a violation of any employment policy that was written down and given to Ms. Cooper in advance? At this early point, we don't know other than what the CEO of Franklin Templeton has said, laying out the blueprint saying we don't rely exclusively on social media in these circumstances. Let me ask you, you started to get into your comparator point, which I understand to be more about gender discrimination, but maybe it's both race and gender. I'm not entirely sure. But you argue that you've stated a prima facie case of at least gender discrimination, because if you look at how the company has treated other people and there's been bad conduct, they haven't been fired. And that seems to me way too broad of a set of comparators. There has to be some level of similar situatedness, right? Here we've got at least one of the people you've identified is not even an employee but a board member. So it seems to me you've got to point to, if you can, ways in which any of the comparators in the complaint line up in any way with the plaintiff in terms of what their position is, what discipline they're subject to, what their levels of responsibilities are in one category of comparison. And then in another category of comparison, what the misconduct is and what its effect on the company is. Because it can't just be that any employee or board member of the defendant who engages in some misconduct and doesn't get fired alone allows an allegation to go to plausibility. Is that your argument? You're right about that, Your Honor. Fortunately, we don't have to get to a prima facie case yet, since we only have motions to dismiss. The prime comparator is Vivek Kudva. You have to state a plausible claim of discrimination. And again, what you've pointed to, at least with respect to the gender, we've talked about our law on racism as not a race, but with respect to the gender. I think your opening argument is look at these comparators. Is there something else we should look to? That is a part of it. And admittedly, the comparator evidence is imperfect at this point. They were all male. They were all male, the comparators. They were. That was the point you were making. Correct. That's correct, Your Honor. I think the other part on the discrimination issue is when the defendants set forth a blueprint for how this investigation and discipline is supposed to go, and they apply it to Vivek Kudva faithfully but apply it in no regard to Ms. Cooper, I think that's enough to nudge us to plausibility to allow us to engage in discovery and find out why. I'm sorry.  I missed what you said. Oh, sure. The blueprint for performing an investigation that goes beyond social media. But it doesn't. None of your comparators was caught on film, and none of your comparators had a 911 call saying there's a black man in Central Park threatening my life. No, that's correct, Your Honor. But all of them were engaged in, or two of the three were engaged in high-profile alleged wrongdoing. That's the comparison. It was in the news. It was high profile. Not through video. You mean, for example, one who 20 years prior had some kind of criminal allegation? That's right, Your Honor. And that is a sufficient comparator to get past plausibility? At the motion to dismiss point, I think it is, Your Honor. With the other items. All right. Thank you. We've kept you over. Counsel, you still have two minutes remaining for rebuttal. Thank you, Your Honor. And we'll hear from Attorney Killian. Yes. Good morning, Your Honor. It's Brian Killian for the Applebee's. The district court was correct to dismiss Amy Cooper's claims because her factual allegations and her admissions actually refute her theories of liability. Cooper admits that she became a public figure internationally three years ago, almost to the day, when the video of her in Central Park went viral on Twitter. Could you raise your mic up? Thank you. Sorry. You're welcome. That is the max. I don't think I get it anymore. But the video, which is undisputed, shows Ms. Cooper can be seen and heard telling a man who's videotaping her that if you don't stop, I'm going to call the police and, quote, tell them there's an African American man threatening my life. As we've discussed, as you've discussed with opposing counsel today, Franklin saw the video. They discussed it with her. She alleges in her complaint that there was a conversation between the company and her and confirmed that the video was real. After that, within a day, Franklin fired her and then tweeted and issued statements in which they disapproved of racism of any kind. And that's the same phrase that is repeated in all the statements. They disapproved of racism of any kind. But did they talk to her? Did they get her side of the story if there was one? She claimed that this man was harassing dog people for months. At this stage of the case, Ms. Cooper's complaint doesn't say what happened during that conversation. All she knows, all she alleges is that the conversation happened, and then she includes the statement from Franklin's CEO that the company was trying to confirm the accuracy of the video, that it had not been a manipulated video. So that's what we have, and that's what makes up the internal review or the investigation. In your view, for the defamation claim, does it matter whether or not, so there's an allegation that an investigation or a thorough investigation didn't take place, does that matter for purposes of the defamation claim as you understand it? No, it doesn't. On Ms. Cooper's theory, it matters because her theory is that the falsity of the statements about the investigation are what show them, prove them to be actionable mixed opinions. But under New York law, a mixed opinion doesn't depend on what the speaker has done. It depends on what the speaker conveys in the statements, whether the reasonable listener, the reasonable reader would infer just from the cold statements that there were more information than was already publicly available that underlies the statements. So, I mean, I think the theory is you said you were going to investigate. Then you say we investigated, and we conclude she's racist or she engaged in an act of racism to take the argument as to what inferences are available. The theory is the undisclosed defamatory statements are our investigation found evidence of acts of racism. Yeah, I think that's Cooper's best articulation of it. I don't see that in her papers. But on your Honor's view, that would be the basis of a theory of mixed opinion. But the undisputed factual allegations in the context here, I think, refute that a reasonable audience would have assumed that Franklin's tweets and statements were anything other than a response to the video that was widely disseminated. And I think there's a couple key facts. Number one, the statements all refer to an investigation or review of the incident in Central Park. This was not purporting to tell the public that Franklin has reviewed her personal life, has looked through her employment files, or even tried to get into this long-running feud between the dog walkers. And here the timing matters for that, right? 100 percent. It's less than hours after the initial video was released on Twitter on May 25th, and then about a day later on May 26th when the internal review is concluded. Well, how about internal of internal review? I mean, could the reasonable reader conclude that that's, okay, well, they're doing something that is internal to the business organization, and therefore an inference from that is all the things you said they didn't say, but we're looking at plausible inferences for motion to dispensate purposes. We don't think so for two reasons. One is the object of the internal review is not Ms. Cooper. It's still the internal review of the incident in Central Park, and that's very clear to the audience what's being discussed because the statements don't identify anything else. They don't mention Ms. Cooper by name. They only refer to the incident, which the public only knew about because of the video. And so these statements were clearly responses to the video that everyone already knew about. They had no meaning to the public apart from the public's own knowledge of the video. And so in that context, especially during Memorial Day weekend of the very beginning of the lockdowns where companies were, people were forced to be home, there's no way they could have gone out and even obtained the kind of information that Ms. Cooper claims they- And we're to assume the reasonable, I do assume the reasonable reader reads all the words, and I think that's important. I think you've identified, as you heard me indicate, of the incident in Central Park yesterday. It seems quite critical to, at least at this stage, I think, for stalling the argument. But it seems now that you're suggesting the reasonable reader is also thinking about, oh, well, people are starting to be remote and they wouldn't have access to files and things like that. Are we to think about those things? I think the reasonable reader is aware of the context. The context that this is all published on Twitter, which is not a forum that's known for its elaborate deliberations, unlike cases that involve newspapers with investigative reports where it's clear that someone has spent months or even weeks or months investigating a particular topic. This happened quickly in 140 character tweets very soon after the event. And so that is part of the debate that the reasonable participant would himself or herself be aware of and thus part of the context to inform what are they thinking, what is the audience thinking, when Franklin says we did an internal review of the incident in Central Park. How did the public know that Amy Cooper worked at Templeton? We don't know. It's not alleged in the complaint, but it was through Twitter. People figured it out and then tweeted at Franklin Templeton, and that's how we got brought in. Did Franklin Templeton get some tweets about this? That's my understanding, Your Honor. Again, I think we're now moving a little bit beyond what's alleged in the complaint. But, yeah, yes. But the public was quickly following this video and finding out information. And that's within a few hours Franklin responded on Twitter. If I can move to the discrimination claim, because Ms. Cooper tries to take the same statements and use them as evidence that Franklin fired her because of her race or sex. But as Your Honor's noted, statements condemning racism are not statements that are invoking the race of the employee. Racism is not a protected category. Correct. It is not a protected category, and it doesn't even imply that the plaintiff is being acted against because of a protected category. And it is not discrimination under federal or state law for an employer to respond to acts of racism. That's why the federal anti-discrimination laws are there, is to get rid of those from the workplace. And so because it is race and sex neutral to fire an employee for something that was caught on video and publicly seen, Cooper amended her complaint to add these allegations of comparators to try to show how this neutral act was nonetheless discriminatory because of how Franklin treated others. But in order for a comparator to even pass muster at the pleading stage, the comparator has to at least be comparable in the same position within the company, have engaged in comparable conduct. Most of the comparators they mention are higher level than she was. Yes, two of them are executives and one is a non-employee. So doesn't that argue in her favor that the higher ups were given kid gloves treatment and a lower person? No, it doesn't because what it shows is that the comparators aren't the same level of employee as she is to begin with. Not subject to the same policies and disciplinary action. Yes, and the court has already explained, or I'll explain, that the conduct is different. Judge Abrams identified correctly that the conduct that the three men allegedly engage in is not the same as the notorious racial conduct. How similar does the conduct have to be? I mean, it can't be that you need to find, hopefully, exactly the same bad conduct in every discrimination case. Otherwise, you won't be able to bring a discrimination case if you've engaged in really, really egregious bad conduct. So it has to be something less or different, some bandwidth of permissible similarity that is not identical. How do you understand? What words would you use to describe it? The words that the court uses are that it's of comparable seriousness or sort of in the same type of conduct. And I think the court draws that from the McDonnell Douglas factors, which then sort of was used by this court to come up with the all material respect standard. And so the question is, are these of comparable seriousness? And insider training, which is one of the comparators, domestic abuse that happened more than a decade before, and then plagiarism and some minor acts of workplace harassment are not of comparable seriousness. Well, if you look at the question of whether any of those would bring disrepute on the company, if it was widely known, I think they're very comparable. To find out that someone high up in the organization plagiarized a report, to find out that someone high up in the corporation had engaged in sexual peccadilloes. It may be, Your Honor, that the consequences for the company's reputation would be similar, but the test still is, are the employees at the same level? Did they do the same sort of stuff? And were they subject to the same workplace policies? Does the notoriety of the incident, does that matter? I mean, in other words, your argument is that a comparator would have to be of some high level of notoriety. Correct. And not just, it's not comparable if it's, you know, it got a couple of stories in the press. That's right, and it's because we have the video and the allegations about the public response to what had happened. Now, my adversary today has talked a lot about this July 15th, 2021 interview that Franklin's CEO gave. He's mentioned it several times. I just want to raise a couple of responses to that. Number one, that was about two months after they filed their complaint, and it's where he claims, she claims, excuse me, Ms. Cooper claims, that Franklin admits this policy of investigating social media. We think the statement speaks for itself. It's been included in the record. The statement does not say that the company has a formal policy of investigating all claims of social media. It was just a remark that in this particular case, I believe those are the exact words she used, in this particular case, referring to the case of allegedly, supposedly a man, that is not Ms. Cooper, social media had it wrong. So in that off-the-cuff interview is not remotely an indication that the company has a policy of full-blown investigations in response to social media, but even if so, I think we'd fall back on what the district court found, which is that in connection with the assertions that there was a review, there was an investigation, Ms. Cooper has alleged that Franklin did exactly that. So unless the court has any questions further, we'd ask the judgment to be affirmed. Thank you, counsel. Thank you. Thank you. I do want to go back to talk about the video, because we discussed it a little bit earlier, and I think Your Honor had asked me what was said on the video, what was the threatening language. And I want to quote it verbatim, because I think it's powerful and helps to explain with full context what was going on. No, we don't have it in the appellate record. The transcript's on the district court docket, and you don't ‑‑ It's not part of the record before us. It's not part of the appellate record, but it's in the district court docket, right? And you would agree that it's been incorporated into your complaint for purposes of the motion to dissolve? Sort of, Your Honor. I mean, that was sort of an interesting issue in the district court. We referenced the video, or a video, certainly. The defendants were granted permission to show ‑‑ You referenced this video, don't you? I don't know why we need to skirt around that. In this case, can't we take judicial notice of the video? Well, I don't know what the video is. There were snippets of the video played in different places. We have nothing from Franklin Templeton saying what video they watched, where it started, where it ended. The video ‑‑ Why don't we just assume they watched the video that the other hundreds and hundreds of thousands of people around the world watched? Press a button and you see it. Sure. You've seen it, I've seen it. Sure. Probably everybody in the room has seen it. There is a transcript on the district court docket. I presume that's at least what we're agreeing to, that you're discussing. Yes. And what the district court signed it to. Yes, Your Honor. But the threat that was made by Christian Cooper to Amy Cooper was, if you were going to do what you want to do, I'm going to do what I want to do. And you are not going to like it. This was not about race until social media and the defendants made it about race. This was about Christian Cooper, who was an avid bird watcher, being against Amy Cooper, who was a dog walker. So this narrative ‑‑ Wait, wait, wait. She said on the video, did she not, that there's an African American man out here in Central Park threatening my life. Yes, Your Honor, she did. She called 911 and said there's an African American male out here in Central Park threatening my life, didn't she? She absolutely did, Your Honor. So was that statement true or false? That statement was true. She introduced race into the topic. She could have said there's a man here who's threatening me, but she did not. She geared it up. She was afraid for her life. She pressed the red button, didn't she? She didn't know what she was doing. She's a victim of ‑‑ Then why would any responsible financial service company employ someone who couldn't figure out what she was doing out in public? And they could have, on the defamation side of it, they could have fired her without any defamation claim. It was bringing in all of this other stuff, saying an investigation, say we did due diligence, say we did a review. That's why we're here on a defamation claim. They could have just fired her. They could have said we watched the video. We didn't like what we saw. We terminated the employee in question. And there's no defamation claim. It was all of this other nonsense that's brought us here for the defamation claim on a half video. What was the threat to her life? The threat to her life was what I just said, was an individual cornering her, saying if you are going to do what you want to do, meaning walk or dog. But they're out in one of the largest parks in the country, in any city in the country. What do you mean you cornered her? The ramble is very secluded. And my client was afraid for her life. And the complaint even alleges that this is something that Christian Cooper had done before to a male, to an African‑American male who said he was fearful. And if he was alone like Amy was, he would have been afraid for his life, too.  Whatever this was, this was not something that she made up because she's a racist. She was legitimately fearful for her life, and that's why the actionable mixed opinion is so dangerous. Because it told the public that there's no other side to this story. Don't look any deeper than the video, because that's all there is. When there was so much more. I'm sorry, Your Honor? She could have hired a public relations firm if she wanted to tell a different side of the story. Or the defendants could just not defame her. Where does the reasonable reader read in these statements that there's no other side of the story or we're controlling the narrative? It's saying we've looked at ‑‑ we've done a review of the incident in Central Park yesterday, and we've determined that we're firing her and we don't tolerate acts of racism. It doesn't stop the debate. It's speaking, not preventing anyone else from speaking. Respectfully, Your Honor, I don't think it's implausible that a reader would read something that says the facts are undisputed in this case to mean that Franklin Templeton knew more than just what was on the publicly available video. Thank you. All right. Thank you to both counsel. Thank you both. Thank you, Your Honor. Very well argued. Thank you. Yes, thank you both, and the case is taken under ‑‑